UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

LUDWIG'S DRUG STORE, INC., JERMAINE
PRATT, SEAN SCARBOROUGH and GLEN
DEFREITAS,

                  Plaintiffs,

           v.

FOREST CITY ENTERPRISES, INC.,
BROOKLYN EVENTS CENTER, LLC d/b/a
BARCLAYS CENTER, COMPASS GROUP USA,
INC. and LEVY PREMIUM FOODSERVICE
LIMITED PARTNERSHIP,

                  Defendants.

**MEMORANDUM & ORDER**
13-CV-6045 (MKB)

---------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

On March 12, 2014, Plaintiffs Ludwig's Drug Store, Inc. ("Ludwig's"), Jermaine Pratt,

Sean Scarborough and Glen Defreitas filed a Second Amended Complaint[1] in the

above-captioned action asserting claims against Defendants Forest City Enterprises, Inc.

("Forest"), Brooklyn Events Center, LLC, doing business as Barclays Center ("BEC"), Compass

Group USA, Inc. ("Compass") and Levy Premium Foodservice Limited Partnership ("Levy").

The Second Amended Complaint ("SAC") alleges that Defendants discriminated against

Plaintiffs on the basis of race in connection with a license agreement between BEC and

Ludwig's and asserts claims pursuant to (1) the New York State Human Rights Law, N.Y. Exec.

Law § 296(2)(a) ("NYSHRL"); (2) the New York City Human Rights Law, N.Y.C. Admin.

---

[1] Ludwig's commenced this action on October 31, 2013 against Forest, BEC and
Compass One, LLC ("Compass One"). (Compl., Docket Entry No. 1.) On December 5, 2013,
Ludwig's, Pratt, Scarborough and Defreitas filed an Amended Complaint asserting claims
against Forest, BEC and Compass One. (Am. Compl., Docket Entry No. 10.)

Code § 8-107 ("NYCHRL"); (3) 42 U.S.C. § 1981; and (4) 42 U.S.C. § 1983; and (5) for breach of contract claim under New York State law. (SAC ¶¶ 14, 27, 53–76, Docket Entry No. 22.) Plaintiffs seek compensatory and punitive damages, attorney's fees, costs and injunctive relief. (*Id.* ¶¶ 57, 61, 67, 72, 76.)

On June 10, 2014, BEC and Forest moved to dismiss all claims asserted against them in the SAC for failure to state a claim, except for the breach of contract claim by Ludwig's against BEC. (Not. of Mot. to Dismiss on behalf of Defs. Forest & BEC ("Forest & BEC Mot."), Docket Entry No. 30; Mem. in Supp. of Forest & BEC Mot. ("Forest & BEC Mem."), Docket Entry No. 31.) By separate motion filed on June 10, 2014, Compass and Levy moved to dismiss all claims asserted against them in the SAC for failure to state a claim. (Not. of Mot. to Dismiss on behalf of Defs. Compass & Levy ("Compass & Levy Mot."), Docket Entry No. 34; Mem. in Supp. of Compass & Levy Mot. ("Compass & Levy Mem."), Docket Entry No. 36.)

On March 30, 2015, the Court heard oral arguments on Defendants' motions (the "March 30, 2015 Hearing") and, for the reasons stated on the record and explained below, the Court partially granted the motions to dismiss from the bench and reserved decision as to certain claims. (Mar. 31, 2015 Min. Entry.) During the March 30, 2015 Hearing, the Court dismissed: (1) the section 1983 claim against all Defendants; (2) all remaining claims — under section 1981, the NYSHRL and the NYCHRL, and for breach of contract — against Forest and Compass; and (3) the breach of contract claim against Levy. (*Id.*) The Court reserved decision as to the remaining claims against BEC and Levy — under section 1981, the NYSHRL and the NYCHRL — and Pratt's, Scarborough's and Defreitas' (collectively the "Individual Plaintiffs") breach of contract claims against BEC. (*Id.*)

For the reasons set forth below, the Court grants BEC's motion to dismiss the SAC in

part and grants Levy's motion to dismiss in its entirety. The Court dismisses Plaintiffs' section 1981, NYSHRL and NYCHRL claims against BEC and declines to exercise supplemental jurisdiction over Plaintiffs' state law breach of contract claims against BEC.

## I. Background

On October 10, 2013, BEC, as licensor, and Ludwig's, as licensee, entered into the Barclays Center Suite License Agreement (the "Agreement"). (Agreement 1, annexed to SAC as Ex. A, Docket Entry No. 22-1; SAC ¶ 14.) Pursuant to the Agreement, Ludwig's obtained a license to use a suite at the Barclays Center arena located in Brooklyn, New York (the "Arena") in accordance with the Agreement's terms and conditions. Plaintiffs allege that the Individual Plaintiffs use the suite during events held at the Arena and that Defendants have subjected the Individual Plaintiffs and their African-American guests to racial discrimination.

### a. Parties

Ludwig's, a New York corporation, is a "neighborhood pharmacy" located in Brooklyn, New York.[2] (SAC ¶¶ 5, 20.) Defreitas is Ludwig's "designated agent," (*id.* ¶ 6), and Pratt and Scarborough are both employees of Ludwig's, (*id.* ¶¶ 7–8). Defreitas, Pratt and Scarborough are all African-American. (*Id.* ¶¶ 23−24.) Forest, an Ohio corporation licensed to do business in New York, is the owner of the Arena. (*Id.* ¶ 9.) BEC, a Delaware corporation licensed to do business in New York, "manages" the Arena. (*Id.* ¶ 10.) Compass is a North Carolina limited liability company licensed to do business in New York. (*Id.* ¶ 11.) Levy is the wholly-owned subsidiary of Compass. (*Id.* ¶ 12.) Plaintiffs allege "on information and belief" that Levy provides catering services for the Arena. (*Id.*)

---

[2] The facts alleged in the SAC are assumed to be true for the purposes of the motions to dismiss.

### b.  The Arena

Plaintiffs allege that, prior to the construction of the Arena, the State of New York (the "State") expropriated the land on which the Arena now stands through eminent domain.  (*Id.* ¶ 21.)  Plaintiffs also allege that the Metropolitan Transit Authority leases the land on which the Arena is now located from the State.  (*Id.*)  Plaintiffs further allege that Forest receives "tax benefits and public subsidies" from the State, and the State "has also provided significant encouragement to Forest, and by association, to Levy and BEC."  (*Id.* ¶ 22.)

The Arena is the home of the National Basketball Association team known as the Brooklyn Nets and is a venue for a variety of concerts and performances.  (*See* Agreement 3; *see also* SAC ¶ 49.)  There are 104 spectator suites with box-seating located within the Arena.  (SAC ¶¶ 15, 26.)

### c.  The Agreement

The Agreement states, "this Barclays Center Suite License Agreement (this 'License Agreement') is entered into by and between Brooklyn Events Center, LLC d/b/a Barclays Center ('Licensor') . . . and Ludwig[']s Drug Store Inc. ('Licensee') . . . this 10th day of October 2013 (the 'Commencement Date')."  (Agreement 1 (capitalization omitted).)  Richard Mastrota, who is the President of Ludwig's and is Caucasian, signed the Agreement on behalf of Ludwig's.  (Agreement 2; SAC ¶ 23.)  Under the Agreement, BEC agreed to provide Ludwig's with a license to use the suite number B-5 (the "Suite") for a three-year term from October of 2013 to September of 2016.  (Agreement 1; SAC ¶¶ 14, 16.)  In exchange, Ludwig's agreed to pay license fees in accordance with a payment schedule.  (Agreement 1, Schedule B; SAC ¶ 17.)

Pursuant to the Agreement, Ludwig's is entitled to a set number of tickets to certain events held at the Arena, and the tickets may be used by Ludwig's employees and their guests to

access the Suite during such events.  (Agreement 1, 3–4; SAC ¶¶ 14–15.)  The Agreement

includes a provision regarding "Suite Services" that states, in relevant part:

> During the *Term*, Licensor shall furnish to the Suite at its expense
> the following: (a) Maintenance of the Suite and the appliances,
> fixtures, equipment and furniture included therein in good order and
> repair, subject to ordinary wear and tear; provided, however, that
> Licensee shall be responsible for any repairs or replacements
> beyond ordinary wear and tear, such repairs to be made at the
> direction of Licensor and at Licensee's cost (as described below).
> (b) Cleaning service, including vacuuming, removal of debris and
> general cleaning of space within a reasonable time after each Event
> during which Licensee uses the Suite.

(Agreement 5, ¶ 17.)  The Agreement also provides for suite amenities including food and

beverage service during events.  (Agreement Schedule A; SAC ¶ 15.)  The Agreement includes a

provision regarding transfers and assignments, (Agreement 4, ¶ 8), and an integration clause, (*id.*

at 6, ¶ 23).  Plaintiffs allege that Levy provides food and beverage services for the Suite.  (SAC

¶ 18.)  Plaintiffs further allege, upon information and belief, that staff provided by Forest, BEC

and Levy are responsible for "clean[ing], maintain[ing], and servic[ing]" the Suite.[3]  (*Id.* ¶ 19.)

### d.  Alleged discrimination

According to Plaintiffs, each of the Individual Plaintiffs is "directly involved" with the

Suite.  (*Id.* ¶¶ 23–24.)  Upon entering and signing the Agreement on Ludwig's behalf, Mastrota

made Defreitas the "manager" of the Suite and tasked him with handling all "dealings" and

communications with BEC and all ticket distributions in connection with the Agreement.  (*Id.*

---

[3]  The terms of the Agreement only confirm that BEC agreed to "furnish to the Suite at its
expense" maintenance and cleaning services.  (Agreement 5, ¶ 17.)  The Agreement does not
mention Levy, and Forest is only mentioned in provisions that have no bearing on this allegation.
(*See id.* at 4, ¶ 7(a) (indemnity provision stating that BEC's corporate affiliates including Forest
shall not be liable for injuries to persons or property caused by Ludwig's or its invitees); *id.* at 6,
¶ 21 (insurance provision stating that Ludwig's shall maintain commercial general liability
insurance and providing that BEC and affiliates including Forest are to be named as additional
insureds under the policy).)

¶ 23.)  The Individual Plaintiffs frequent the Suite during events at the Arena and they use the Suite to entertain guests.  (*See id.* ¶¶ 24, 40–41.)

Plaintiffs allege, upon information and belief, that, as distinct from the Suite, none of the other suites in the Arena are "licensed, managed, or typically utilized by African[-]Americans." (*Id.* ¶ 25.)  Plaintiffs further allege that Defendants discriminated against the Individual Plaintiffs and their African-American guests on account of their race.  (*Id.* ¶ 27.)

### i.    BEC's refusal to interface with Defreitas as Suite manager

According to Plaintiffs, at the time when BEC and Ludwig's entered the Agreement, Mastrota advised BEC that Defreitas would be managing the Suite.  (*Id.* ¶ 23.)  Although Mastrota directed BEC to interface solely with Defreitas and asked that BEC send all correspondence and tickets directly to Defreitas, BEC ignored these requests and instead sent all correspondence and tickets to Mastrota.  (*Id.*)  BEC also invited Mastrota, and not Defreitas, to a dinner organized for suite holders.  (*Id.* ¶ 28.)  When Mastrota reiterated his instructions to BEC regarding Defreitas, BEC "refused to work through Defreitas."  (*Id.* ¶ 23.)  Plaintiffs also allege that Defendants did not provide them with tickets to certain "special events," including the "Legends Classic 2013," even though Plaintiffs were entitled to such tickets under the Agreement.  (*Id.* ¶ 29.)

### ii.   Harassment of the Individual Plaintiffs by Arena staff and security

Plaintiffs allege that the Individual Plaintiffs are "continually harassed, followed, and questioned" when they attend events at the Arena.  (*Id.* ¶ 39.)  Plaintiffs specifically allege three instances of such harassment.  (*See id.* ¶¶ 30–31.)  Plaintiffs allege, upon information and belief, that non-African-American patrons are not subjected to the same treatment by Arena staff.  (*Id.* ¶ 39.)

On or about October 19, 2013, while using the Suite, the Individual Plaintiffs overheard a radio communication indicating that "the people in their Suite were considered a security threat." (*Id.* ¶ 31.) Shortly thereafter, Arena security raided suite number B-16, which is located on the same level of the Arena as the Suite. (*Id.*; Diagram of Approx. Location of the Suite, annexed to Agreement as Ex. A.) During the raid, the people present in suite B-16 were forced to remain on the ground while security checked their identification. (SAC ¶ 31.) Plaintiffs allege, upon information and belief, that the raid of suite B-16 was a mistake because security actually intended to raid the Suite. (*Id.*)

Plaintiffs also allege that Lawrence Saurs, who was employed by BEC as its "Manager of Premium Partnerships," "treated Defreitas as if he did not belong" in the Arena. (*Id.* ¶ 30.) Plaintiffs further allege, upon information and belief, that BEC "directed Saurs to treat Defreitas suspiciously based on his race." (*Id.*) On or about October 19, 2013, when Saurs encountered Defreitas at a "VIP entrance" to the Arena, Saurs asked Defreitas why he was frequently at the Arena. (*Id.*) Approximately one week later, during another encounter between Saurs and Defreitas at the same VIP entrance, Saurs again asked Defreitas why he was frequently at the Arena, and Defreitas told Saurs that he had licensed a suite. (*Id.*) In response, Saurs stated "sometimes I have to be the bad guy" and told Defreitas that he had a background in law enforcement. (*Id.*)

### iii. Substandard food, beverage, cleaning and maintenance services

Plaintiffs allege that when the Individual Plaintiffs and their African-American guests use the Suite, they are subjected to "deplorable" food, beverage, cleaning and maintenance services. (*Id.* ¶ 32.) Plaintiffs also allege, "[u]pon information and belief, [that] Levy executives have directed their staff to provide subpar" services to the Suite, (*id.* ¶ 35), and Jordan Beckerman, a

7

"supervisor" at Levy, "has [] warned Levy employees to avoid [the Suite]," (*id.* ¶¶ 48, 50).

Plaintiffs further allege that "proper" services are provided to the Arena's other suites, which are

licensed by and used to host non-African-American patrons.  (*Id.* ¶ 34.)  Plaintiffs also allege that

"when [the Suite] hosts numerous Caucasian guests, food and housekeeping service is proper."

(*Id.* ¶ 33.)

### 1.    Cleaning services

Plaintiffs allege that "housekeeping does not clean [the Suite] without a specific request"

and the Suite is "routinely" left "dirty and disorganized."  (*Id.* ¶ 32.)  Plaintiffs allege that on

November 19, 2013, because housekeeping had "left [the Suite] as a mess," Pratt was cleaning

the Suite himself and a patron from a neighboring suite licensed by CBS Radio observed Pratt

doing so.  (*Id.* ¶ 36.)  Plaintiffs allege that the CBS Radio suite is "regularly and immaculately

cleaned," and that the CBS Radio patron was "shocked" at the state of the Suite and asked Pratt

why housekeeping was not cleaning the Suite.  (*Id.* ¶¶ 36–37.)

### 2.    Food and beverage services

Plaintiffs allege that food and drink orders are "routinely" delivered to the Suite "very

late, if at all," and, "upon inquiries, African[-]Americans are frequently told that the kitchen is

closed."  (*Id.* ¶ 32.)  Plaintiffs allege that on or about October 26, 2013, the Individual Plaintiffs

attended an event at the Arena with a guest and they ordered pizza from the Suite.  (*Id.* ¶ 40.)

Plaintiffs also allege that they were falsely accused of not paying for the pizza and, after Pratt

provided a credit card to resolve the issue, he was charged $1,000 for the pizza and this amount

was never refunded or adjusted.  (*Id.*)

According to Plaintiffs, on October 28, 2013, Defreitas used the Suite with a

"dark-skinned" guest and they ordered food, drinks and ice.  (*Id.* ¶ 41.)  When the order had not

arrived after forty-five minutes, Defreitas inquired as to when the order would be delivered and was told that the order required approval from a supervisor.  (*Id.*)  When the ice arrived, it was delivered in a "dirty" bucket and Defreitas' guest was ultimately charged for multiple items that he neither ordered nor received.  (*Id.*)

Plaintiffs also allege that on March 10, 2014, Defreitas hosted seven African-American guests in the Suite who ordered French fries.  (*Id.* ¶ 44.)  The French fries were not delivered until after an hour had passed and Defreitas had "intervened."  (*Id.*)  Plaintiffs allege that when the Suite hosts Caucasian guests, such delays do not occur.  (*Id.* ¶ 45.)  Finally, Plaintiffs allege that the Individual Plaintiffs are "routinely" denied access to refrigerators located in the Suite despite the fact that they are entitled to access the food in these refrigerators.  (*Id.* ¶ 38.)  When the Individual Plaintiffs attempt to access these refrigerators, they are told that verification from a supervisor is required, and access is often denied even after the Individual Plaintiffs obtain such verification.  (*Id.*)

### 3.  Maintenance services

Plaintiffs allege that on December 25, 2013, Defreitas was using the Suite and he "called maintenance to secure a TV that was falling from the wall."  (*Id.* ¶ 43.)  In response to Defreitas' request, a "supervisor" stated, "did you or one of the kids pull the TV off of the wall?  TV's don't just fall off walls!"  (*Id.*)  Defreitas responded to the supervisor's comment by explaining "that no one had touched the TV."  (*Id.*)  The supervisor then stated "it was just a question, it's weird that a TV would just fall off the wall."  (*Id.*)

### e.  Additional allegations

Plaintiffs allege that "on numerous occasions" Defreitas' personal items were stolen from the Suite when Plaintiffs and their guests were not present in the Suite.  (*Id.* ¶ 42.)

## II.  Discussion

### a.  Standard of review

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must "accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff." *Tsirelman v. Daines*, 794 F.3d 310, 313 (2d Cir. 2015) (quoting *Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997)); *see also Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 320 (2d Cir. 2009)).  A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson*, 631 F.3d at 63 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717–18 (2d Cir. 2013).  Although all allegations contained in the complaint are assumed true, this principle is "inapplicable to legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."[4] *Iqbal*, 556 U.S. at 678.

---

[4]  When deciding a motion to dismiss, a court's review is limited to the four corners of the complaint but a court may also review (1) documents attached to the complaint, (2) any documents incorporated in the complaint by reference, (3) documents deemed integral to the complaint, and (4) public records.  *See L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (documents attached to the complaint, those incorporated by reference, and those integral to the complaint); *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006) (documents integral to the complaint); *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (public records).

### b. Section 1983 claim

Ruling from the bench, the Court granted Defendants' motion to dismiss Plaintiffs' claim pursuant to section 1983 for failure to state a claim. In order to sustain a claim for relief under section 1983, a plaintiff must allege (1) that the challenged conduct was "committed by a person acting under color of state law," and (2) that such conduct "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010) (quoting *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994)). The first element reflects the fact that section 1983 "constrains only state conduct, not the 'acts of private persons or entities.'" *Hooda v. Brookhaven Nat'l Lab.*, 659 F. Supp. 2d 382, 393 (E.D.N.Y. 2009) (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 837 (1982)). As such, "the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (citation and internal quotation marks omitted).

### i. State action by private entities

The conduct of a nominally private entity may be attributed to the state, satisfying the state action requirement, if:

> (1) the entity acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the entity, the entity is a "willful participant in joint activity with the state," or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated a public function by the state," ("the public function test").

*Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (citing *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001)); *see Sykes v. Bank of Am.*, 723 F.3d 399, 406 (2d Cir. 2013). Each of the three tests requires a fact-specific inquiry into the challenged conduct and, in order to find state action, a court must determine that

the specific actions of which the plaintiff complains may fairly be attributed to the state. *See*

*Grogan v. Blooming Grove Volunteer Ambulance Corps*, 768 F.3d 259, 265 (2d Cir. 2014)

(examining public function test); *Cooper v. U.S. Postal Serv.*, 577 F.3d 479, 491–92 (2d Cir.

2009) (examining joint action test); *Lynch v. Southampton Animal Shelter Found. Inc.*, 971 F.

Supp. 2d 340, 349–50 (E.D.N.Y. 2013) (examining compulsion test).

In moving to dismiss Plaintiffs' section 1983 claim, Defendants asserted that Plaintiffs

failed to adequately allege state action. (Forest & BEC Mem. 7–10; Compass & Levy Mem.

18 & n.17.) In opposition, Plaintiffs argued that they had sufficiency alleged that Defendants

engaged in state action based on the joint action or close nexus test and the public function test.

(Pls. Mem. in Opp'n to Forest & BEC Mot. ("Opp'n to Forest & BEC Mot.") 6–8, Docket

Entry No. 38; Pls. Mem. in Opp'n to Compass & Levy Mot. ("Opp'n to Compass & Levy Mot.")

19–20, Docket Entry No. 37.) In response, Defendants argued that the allegations in support of

state action did not satisfy either of the tests relied on by Plaintiffs. (Reply Mem. in Supp. of

Forest & BEC Mot. ("Forest & BEC Reply") 3–4, Docket Entry No. 33; Reply Mem. in Supp. of

Compass & Levy Mot. ("Compass & Levy Reply") 10–11, Docket Entry No. 39.) Defendants

also argued that Plaintiffs failed to allege state action because Plaintiffs did not allege that there

was any state involvement in the specific conduct complained of. (Forest & BEC Reply 2–3;

Compass & Levy Reply 11.) Defendants further argued that Plaintiffs instead relied on

allegations about state involvement in activity that was unrelated to the specific activity claimed

to have caused the injury giving rise to this action. (Forest & BEC Reply 2–3; Compass & Levy

Reply 11.) The sufficiency of the allegations as to each test are discussed below.

### 1. Joint action or close nexus test

Plaintiffs allege that Forest receives tax benefits and public subsidies such that the State

has "provided significant encouragement to [Forest], and by association, to Levy and BEC," (SAC ¶ 22); the Arena was built on land that New York State obtained by exercising its eminent domain power, (*id.* ¶ 21); and the Arena is located on land leased from the State, (*id.* ¶ 22). During oral argument, Plaintiffs' counsel also asserted that the Arena "was built using public funds," (Tr. of Mar. 30, 2015 Hr'g ("Tr.") 4:14), that police officers "assist the [A]rena . . . [by directing] the flow of people [coming] in and out of the [A]rena," (Tr. 7:9–12), and that Levy is required to comply with State public health laws that regulate the sale of food and beverages to the public, (Tr. 8:16–21).

Under the close nexus or joint action test, the requisite nexus between the State and the challenged conduct exists "where a private actor has operated as a willful participant in joint activity with the State or its agents, or acts together with state officials or with significant state aid." *Abdullahi*, 562 F.3d at 188 (internal citations and quotation marks omitted); *Barrett v. Harwood*, 189 F.3d 297, 304 (2d Cir. 1999) ("A private person — not a government official — acts under color of state law for purposes of § 1983 when 'he has acted together with or has obtained significant aid from state officials' . . . ." (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982))). "[A] private entity does not become a state actor for purposes of § 1983 merely on the basis of 'the private entity's creation, funding, licensing, or regulation by the government.'" *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012) (quoting *Cranley v. Nat'l Life Ins. Co. of Vt.*, 318 F.3d 105, 112 (2d Cir. 2003)). It is also not sufficient "to plead state involvement in some activity of the institution alleged to have inflicted injury upon a plaintiff; rather, the plaintiff must allege that the state was involved with the activity that caused the injury giving rise to the action." *Sybalski*, 546 F.3d at 258 (emphasis, internal quotation marks and citations omitted).

That Forest receives tax benefits and public funding does not suffice to allege that Forest, or any other Defendant, engaged in state action. *See Young v. Halle Hous. Assocs., L.P.*, 152 F. Supp. 2d 355, 364 (S.D.N.Y. 2001) (granting summary judgment dismissing § 1983 claim brought by residents of privately-owned, low-income housing facility who challenged the facility's policy regarding overnight guests because mere fact that housing facility "benefitted from significant amounts of government funding" and public subsidies was not sufficient to satisfy state action requirement); *Elmasri v. England*, 111 F. Supp. 2d 212, 221 (E.D.N.Y. 2000) (granting summary judgment dismissing § 1983 claim challenging outcome of divorce and custody proceedings and holding that court appointed guardian and psychologist were not state actors even though they were paid with state funds).[5]

The fact that Levy is subject to state regulation is also insufficient to allege state action.

---

[5] *But see Ludtke v. Kuhn*, 461 F. Supp. 86, 92–96 (S.D.N.Y. 1978) (concluding that City's involvement with Yankee Stadium was sufficient to satisfy state action requirement for purposes of § 1983 gender discrimination claim challenging Stadium policy that barred female reporters from entering Clubhouse locker room). In *Ludtke*, the court held that the Stadium's enforcement of the policy at issue constituted state action because the City acquired Yankee Stadium by exercising its eminent domain power, the Yankees leased the Stadium from the City, and public funds were used to pay for the Stadium's renovation and maintenance. *Id.* The *Ludtke* court based this holding on the "symbiotic relationship" test established by the Supreme Court in *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961). *Ludtke*, 461 F. Supp. at 93–94 (discussing *Burton* and noting that "[t]he facts of the case at hand so nearly resemble those of *Burton* that there can be little doubt that state action exists here"). Since the *Ludtke* opinion, however, the Second Circuit has indicated that "federal courts must assess the continued vitality of earlier state-action precedents in light of more recent decisional law." *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 314 (2d Cir. 2007) (discussing state action requirement and noting that while the "Warren Court took an expansive view of state action in its effort to combat racial discrimination[,] . . . the subsequent Burger and Rehnquist Courts reversed this trend in order to shield private behavior from the reach of the Constitution"), *aff'd sub nom. Am. Isuzu Motors, Inc. v. Ntsebeza*, 553 U.S. 1028 (2008). The Second Circuit has further stated that *Burton* was "one of the Warren Court cases that took an expansive view of state action" and that, "[a]lthough neither *Burton* nor the symbiotic relationship doctrine has been overruled, they have been severely narrowed in scope and diminished as precedent." *Id.* at 314 n.8 (quoting 1 Martin A. Schwartz, *Section 1983 Litigation: Claims and Defenses* § 5.13[A], at 5–90–5–91 (4th ed. 2003)).

*See Hollander v. Copacabana Nightclub*, 624 F.3d 30, 33–34 (2d Cir. 2010) (affirming dismissal of § 1983 gender discrimination claim challenging nightclubs' admissions policy and concluding that plaintiff failed to allege state action notwithstanding state regulations governing sale of alcohol by nightclubs and that nightclubs' liquor licenses were issued by state); *Cranley*, 318 F.3d at 112–13 (affirming dismissal of § 1983 claim and concluding that insurance company did not engage in state action during its reorganization into a holding company notwithstanding that reorganization was carried out in accordance with state law governing reorganization of insurance companies).

The allegations are also insufficient because Plaintiffs fail to allege any state involvement in the precise conduct on which Plaintiffs' claims are based, namely, the harassment and substandard service the Individual Plaintiffs have allegedly been subjected to when they attend events at the Arena and use the Suite. *See Hollander*, 624 F.3d at 34 (holding that allegedly discriminatory nightclub admissions policy was too attenuated from state regulation of alcohol sales and issuance of liquor licenses to satisfy state action requirement); *Young*, 152 F. Supp. 2d at 364 ("[T]he crucial relationship for a finding of state action is between the governmental entity and the *action* taken by the private entity, not between the governmental entity and the private *actor*."). Plaintiffs therefore failed to allege state action pursuant to the joint action or close nexus test.

### 2. Public function test

Plaintiffs allege that "[b]ecause [Forest] receives tax benefits and public subsidies, it is a public function of the state." (SAC ¶ 22.) Plaintiffs further allege that the Arena is "a place of public accommodation." (*Id.* ¶ 74.)

"Under the public function test, '[s]tate action may be found in situations where an

activity that traditionally has been the exclusive, or near exclusive, function of the State has been contracted out to a private entity.'" *Grogan*, 768 F.3d at 264–65 (quoting *Horvath v. Westport Library Ass'n*, 362 F.3d 147, 151 (2d Cir. 2004)). The test is not satisfied where a private entity engages in activity that has merely "been regularly performed by governments." *Grogan*, 768 F.3d at 265. Rather, the private entity must engage in activity that has historically been the "exclusive prerogative" of the state. *Id.* This test is stringent because, "[w]hile many functions have been traditionally performed by governments, very few have been exclusively reserved to the State." *Flagg Bros. v. Brooks*, 436 U.S. 149, 158 (1978) (internal quotation marks omitted). Courts have concluded that activities such as holding local primary elections, *Terry v. Adams*, 345 U.S. 461, 469–70 (1953), providing medical care for prison inmates, *West v. Atkins*, 487 U.S. 42, 54–57 (1988), and creating and operating post offices, *Cooper*, 577 F.3d at 492–93, have historically been the exclusive prerogative of the state. By contrast, the public function test is not satisfied by conduct such as supplying utility services, *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352–53 (1974), and providing nursing home services to Medicaid recipients, *Blum v. Yaretsky*, 457 U.S. 991, 1011–12 (1982).

While neither the Second Circuit nor any district courts within the Second Circuit have addressed the public function test with respect to the operation of stadiums like the Arena, two district courts outside the Second Circuit have held that the public function test is not satisfied in this context. *See Bessey v. Spectrum Arena, L.P.*, No. 11-CV-7099, 2011 WL 6779306, at *1–2, *4 (E.D. Pa. Dec. 23, 2011) (denying plaintiffs' motion to enjoin private entity that owned and operated sports arena from enforcing policy prohibiting protests at arena and holding that there was no state action under public function test because "[w]hile professional sports, concerts and other entertainment events enhance the cultural and civic life of a community, providing these

services is not the exclusive province of the State and, in fact, is not a governmental function"); *Stark v. Seattle Seahawks*, No. 06-CV-1719, 2007 WL 1821017, at *1–2, *7 (W.D. Wash. June 22, 2007) (granting summary judgment motion and dismissing § 1983 claim against private entity vested with exclusive power and authority to operate a publically-owned sports stadium because "the court is not persuaded that operating an event center is a function that has traditionally and exclusively been reserved to the state"). The Court agrees that because the operation of a sports arena is not a function that is traditionally and exclusively reserved to the state, Plaintiffs failed to allege state action pursuant to the public function test.

Because the allegations are insufficient to satisfy the threshold state action requirement under either the joint action or close nexus test or the public function test, Plaintiffs failed to state a claim pursuant to section 1983 and, accordingly, the Court dismissed Plaintiffs' section 1983 claim as to all Defendants at the March 30, 2015 Hearing.

### c. Remaining claims against Forest and Compass

In addition to the section 1983 claim, the SAC also asserts four additional claims against Forest and Compass, under (1) section 1981, (2) the NYSHRL and (3) the NYCHRL, and (4) for breach of contract under New York State law. (*See* SAC ¶¶ 54–56, 60, 65, 69–71 (asserting foregoing claims against "Defendants" without limitation).) As further explained below, the Court dismissed these remaining claims against Forest and Compass during the March 30, 2015 Hearing for failure to state a claim. (Tr. 50:19–21, 56:24–57:2; Mar. 31, 2015 Min. Entry.)

In support of the remaining claims against Forest, the SAC alleges that Forest owns the Arena. (SAC ¶ 9.) The SAC also alleges "[u]pon information and belief, [the Suite] was to be cleaned, maintained, and serviced by staff provided by [Forest], BEC, and Levy (the 'Staff')." (*Id.* ¶ 19.) While the SAC alleges that various actions were undertaken by "the Staff," as this

term is defined in the SAC, and by "housekeeping" and "maintenance," which terms are not defined, the SAC fails to allege any specific conduct or action by Forest.[6]  In addition, there are no facts alleged from which the Court may plausibly infer that Forest was involved in food and beverage, cleaning or maintenance services.[7]  With respect to Compass, the SAC alleges only that Compass is the parent company of Levy.  (SAC ¶ 12.)

Rule 8(a) of the Federal Rules of Civil Procedure "does not demand that a complaint be a model of clarity or exhaustively present the facts alleged." *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001).  However, at a minimum the complaint must, "give each defendant 'fair notice of what the plaintiff's claim is and the ground upon which it rests.'" *Id.* (quoting *Ferro v. Ry. Express Agency, Inc.*, 296 F.2d 847, 851 (2d Cir. 1961)).  This standard is not satisfied "[b]y lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct." *Id.* at 34.  Rather, a complaint should provide "specification

---

[6] (*See* SAC ¶ 32 (alleging that "[t]he Staff provides deplorable service" to the Individual Plaintiffs because food and drink deliveries are routinely late and "housekeeping does not clean" the Suite and routinely leaves it dirty and disorganized); *id.* ¶ 36 (alleging a specific instance in which "housekeeping left [the Suite] as a mess"); *id.* ¶ 38 (alleging that "the Staff tells" the Individual Plaintiffs that "supervisor verification" is needed to access refrigerators in the Suite); *id.* ¶ 39 (alleging that the Individual Plaintiffs are "continually harassed, followed, and questioned by Staff"); *id.* ¶ 40 (alleging a specific instance in which "the Staff accused" the Individual Plaintiffs and a guest of not paying for pizza); *id.* ¶ 43 (alleging a specific instance in which Defreitas "called maintenance" and stating comments of unidentified "supervisor" in response); *id.* ¶ 46 (alleging that when non-party Andrew Mapp attended events in the Suite "his treatment by the Staff was atrocious").)

[7] For example, Plaintiffs make no allegations about specific Forest executives or employees and the Agreement provides only that BEC "shall furnish to the Suite at its expense" maintenance and cleaning services.  (Agreement 5.)  In fact, Forest is only mentioned in two provisions of the Agreement, neither of which suggests Forest was involved in the conduct of which Plaintiffs complain.  (*Id.* at 4 (indemnity provision stating that BEC's corporate affiliates including Forest shall not be liable for injuries to persons or property caused by Ludwig's or its invitees); *id.* at 6 (insurance provision stating that Ludwig's shall maintain commercial general liability insurance and providing that BEC and affiliates including Forest must be named as additional insureds).)

of any particular activities by any particular defendant." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007); *see In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 417 (S.D.N.Y. 2011) ("Although Plaintiffs argue that they alleged that the [p]arent [c]ompanies were directly involved in the alleged conspiracy, a reading of the complaint indicates otherwise. The complaint alleges direct involvement of the [p]arent [c]ompanies by way of generic references to 'defendants.' This approach is insufficient." (internal citations omitted)).

During the March 30, 2015 Hearing, counsel for both Forest and Compass argued that the SAC failed to allege any conduct by Forest or Compass. (Tr. 55:14–18 (Forest); Tr. 49:9–20 (Compass).) In response, Plaintiffs' counsel stated, "I don't think [Plaintiffs] were ever aware as to the extent of [Forest's] . . . connection . . . with [the Arena], and until I am able to do a deposition, I do not believe I can satisfy [the] requirement [of alleging conduct by Forest]." (Tr. 56:19–23.) Given the dearth of any allegations of conduct by Forest or Compass, the Court dismissed all remaining claims against Forest and Compass as insufficiently pled. *See Sherman v. Town of Chester*, 752 F.3d 554, 557–58, 567 (2d Cir. 2014) (affirming dismissal of § 1981 action brought by Jewish developer who claimed town discriminated against him by perpetually refusing to approve his subdivision proposal because, although town residents allegedly expressed fear that proposed subdivision "might become a 'Hassidic Village'" and plaintiff's model-home was allegedly vandalized with a swastika, no facts were alleged to link this conduct to the town).

### d. Breach of contract claim against Levy

As further explained below, the Court dismissed the breach of contract claim against Levy during the March 30, 2015 Hearing for failure to state a claim. (Tr. 68:12–21.)

Plaintiffs' breach of contract claim is based on the Agreement entered into by Ludwig's

and BEC.  (SAC ¶ 63.)  The SAC asserts that "Defendants have failed to perform by failing [to] properly . . . maintain and clean [the Suite] in violation of paragraph 17b of the Agreement."  (*Id.* ¶ 65.)  Paragraph 17 of the Agreement provides, in pertinent part: "Suite Services.  During the Term, [BEC] shall furnish to the Suite at its expense the following: . . . (b) Cleaning service, including vacuuming, removal of debris and general cleaning of space within a reasonable time after each Event during which [Ludwig's] uses the Suite."  (Agreement 5, ¶ 17.)  The Agreement does not mention Levy.  However, the SAC alleges that Levy provides food and beverage services for the Suite.  (SAC ¶ 18.)

In support of its motion to dismiss Plaintiffs' breach of contract claim, Levy argued that Plaintiffs could not state a claim against Levy pursuant to the Agreement because Levy is not a party to the Agreement.  (Compass & Levy Mem. 14–15.)  In response, Plaintiffs conceded that Levy is not a party to the Agreement but asserted that the breach claim should nonetheless be permitted to proceed against Levy.  (Opp'n to Compass & Levy Mot. 17.)  Plaintiffs argued that, although Levy is not a party to the Agreement, their breach of contract claim against Levy should not be dismissed because "Plaintiffs would not be able to recover in unjust enrichment," (*id.*) given that "claims for unjust enrichment may be precluded by the existence of a contract governing the subject matter of the dispute even if one of the parties to the lawsuit is not a party to the contract," (*id.* (quoting *LaRoss Partners, LLC v. Contact 911 Inc.*, 874 F. Supp. 2d 147, 165 (E.D.N.Y. 2012))).  Levy argued that Plaintiffs' position was meritless and that the case relied on by Plaintiffs is inapposite.  (Compass & Levy Reply 7.)

"To state a claim for breach of contract under New York law, 'the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages.'"  *Orlander v. Staples, Inc.*, --- F.3d ---, ---, 2015 WL

5438783, at *3 (2d Cir. Sept. 16, 2015) (quoting *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011)); *see also Noise In the Attic Prods., Inc. v. London Records*, 782 N.Y.S.2d 1, 3 (App. Div. 2004). Contracts are generally unenforceable against non-parties given "the fundamental principle of contract law prohibiting the parties to a contract from binding nonparties." *Davis v. Blige*, 505 F.3d 90, 103 (2d Cir. 2007); *see Sheldon v. Khanal*, 396 F. App'x 737, 740 (2d Cir. 2010) ("We easily conclude that plaintiffs failed to state a claim for breach of contract against the . . . defendants, as it is not alleged that they were party to any contract with plaintiffs."); *see also Kamdem-Ouaffo v. Pepsico, Inc.*, No. 14-CV-227, 2015 WL 1011816, at *7 (S.D.N.Y. Mar. 9, 2015) ("It is hornbook law that an entity must be a party to a contract for a claim of breach of that contract to lie, unless the entity has assumed or been assigned the contract."); *Malmsteen v. Universal Music Grp., Inc.*, 940 F. Supp. 2d 123, 135 (S.D.N.Y. 2013) ("A contract cannot bind a non-party unless the contract was signed by the party's agent, the contract was assigned to the party, or the signatory is in fact the 'alter ego' of the party." (citation omitted)).

Here, Plaintiffs do not allege that Levy is a party to the Agreement. Nor do Plaintiffs allege that the Agreement was signed by Levy's agent or alter-ego, or that the Agreement was assigned to Levy. Accordingly, Plaintiffs fail to state a breach claim against Levy. *See Sheldon*, 396 F. App'x at 740; *Malmsteen*, 940 F. Supp. 2d at 135. In arguing that their breach claim should not be dismissed because the Agreement may preclude an unjust enrichment claim against Levy, Plaintiffs rely on *LaRoss Partners, LLC v. Contact 911 Inc.*, 874 F. Supp. 2d 147 (E.D.N.Y. 2012). (Opp'n to Compass & Levy Mot. 17.) *LaRoss Partners*, however, does not support the proposition that a breach of contract claim may be stated against a non-party where the non-party is alleged to have been unjustly enriched in connection with the contract. *LaRoss*

*Partners*, 874 F. Supp. 2d at 152, 165–66. In *LaRoss Partners*, the court determined that an unjust enrichment claim was precluded by the existence of a contract governing the subject matter of the dispute, notwithstanding that the claim was asserted against a non-signatory to the contract. *Id.* at 165–66. Although the plaintiff in *LaRoss Partners* also asserted a breach of contract claim against the non-signatory, the non-signatory did not move to dismiss the breach claim. *See id.* at 169. As such, the court did not address the merits of the breach claim or the issue of whether an otherwise deficient breach claim is viable in such circumstances due to the unavailability of an unjust enrichment claim. The breach of contract claim against Levy was therefore dismissed during the March 30, 2015 Hearing.

### e. Section 1981 claim against BEC and Levy

The Individual Plaintiffs allege that Defendants violated section 1981 by subjecting the Individual Plaintiffs and their African-American guests to racial discrimination and "interfer[ing] with Plaintiffs' rights to make and enforce contracts."[8] (SAC ¶ 60.) Having already determined during the March 30, 2015 Hearing that the SAC fails to state any claims against Forest and Compass, only the section 1981 claims against BEC and Levy remain.

The SAC states the following allegations in support of the Individual Plaintiffs' claims under section 1981: (1) the Individual Plaintiffs are harassed by Arena staff and security

---

[8] The SAC asserts discrimination claims under section 1981, the NYSHRL and the NYCHRL on behalf of all Plaintiffs. (SAC ¶ 60.) In their motion to dismiss, BEC and Forest argued that the discrimination claims on behalf of Ludwig's should be dismissed because the SAC fails to allege that Ludwig's, the corporate entity, was subjected to discrimination. (Forest & BEC Mem. 16–17.) In response, Plaintiffs argued that "Ludwig's has been discriminated against due to its association with the Individual Plaintiffs." (Opp'n to Forest & BEC Mot. 15–16.) However, at the March 30, 2015 Hearing, Plaintiffs' counsel stated that the discrimination claims are only asserted on behalf of the Individual Plaintiffs. (Tr. 60:9–20.) As such, the Court only addresses the discrimination claims brought by the Individual Plaintiffs and dismisses any discrimination claims by Ludwig's.

personnel when they attend events at the Arena, (*id.* ¶¶ 30–31, 39); (2) the cleaning services provided to the Suite are substandard, (*id.* ¶¶ 32–34, 36–37); (3) the maintenance services provided to the Suite are substandard, (*id.* ¶ 43); (4) BEC has refused to interface with Defreitas as the manager of the Suite and has not provided Defreitas with tickets to certain suite-holder events, (*id.* ¶¶ 23, 28–29); (5) Defreitas' personal items have been stolen from the Suite, (*id.* ¶ 42); (6) the Individual Plaintiffs and their African-American guests are subjected to substandard food and beverage services when they use the Suite, (*id.* ¶¶ 32–35, 40–41, 44–45); and (7) the Individual Plaintiffs are denied access to the refrigerators located in the Suite, (*id.* ¶ 38). The allegations regarding harassment by Arena staff and security, the cleaning services provided to the Suite, the maintenance services provided to the Suite, BEC's refusal to interface with Defreitas and to provide him with certain tickets, and the theft of Defreitas' personal items appear to be based solely on conduct allegedly undertaken by employees or agents of BEC. (Opp'n to Forest & BEC Mot. 2–3.) The food and beverage services allegations, by contrast, appear to be based solely on conduct allegedly undertaken by employees or agents of Levy. (Opp'n to Compass & Levy Mot. 2–3.) The Individual Plaintiffs also appear to allege that employees or agents of both BEC and Levy have prevented them from accessing the Suite's refrigerators. (Opp'n to Forest & BEC Mot. 2–3; Opp'n to Compass & Levy Mot. 2–3.) BEC and Levy argue that the allegations are insufficient to state a claim under section 1981.

Section 1981 states that:

> [a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). For purposes of claims premised on the impairment of a plaintiff's right to

make and enforce contracts, section 1981 defines the phrase "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). To state a claim under section 1981, a plaintiff must allege that "(1) [he] is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute." *Bentley, Jr. v. Mobil Gas Station*, 599 F. App'x 395, 396 (2d Cir. 2015) (quoting *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993)). BEC and Levy argue that the Individual Plaintiffs fail to sufficiently allege the second and third elements. (Forest & BEC Mem. 10–15; Compass & Levy Mem. 9–14.) Because, for the reasons explained below, the Court concludes that the Individual Plaintiffs fail to allege "circumstances giving rise to a plausible inference of racially discriminatory intent," *Yusuf v. Vassar Coll.*, 35 F.3d 709, 713 (2d Cir. 1994), the second element is dispositive and the Court therefore declines to address the sufficiency of the allegations as to the third element.

Direct evidence of discriminatory intent is not required to satisfy the second element of a section 1981 claim, as a plaintiff may instead rely on circumstantial evidence that supports an inference of discrimination. *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 104 (2d Cir. 2001) (stating, in context of reviewing grant of summary judgment dismissing § 1981 claims brought by restaurant patrons, that "direct evidence of discrimination is not necessary" because discrimination claims may be based on "sufficient circumstantial evidence"). An inference of discrimination may be drawn where "similarly situated" patrons, who are not members of the relevant protected class, are treated differently than the plaintiffs who allege discrimination under section 1981. *See id.* at 101. "When plaintiffs seek to draw inferences of discrimination

by showing that they were 'similarly situated in all material respects' to the individuals to whom they compare themselves, their circumstances need not be identical, but there should be a reasonably close resemblance of facts and circumstances." *Id.* (internal citation omitted).

At the motion to dismiss stage, a plaintiff must "specifically allege the 'circumstances giving rise to a plausible inference of racially discriminatory intent.'" *Bentley, Jr.*, 599 F. App'x at 396 (quoting *Yusuf*, 35 F.3d at 713). "A plaintiff's naked allegation that the defendant acted based on the plaintiff's race and color is too conclusory to survive a motion to dismiss." *Id.* (citing *Albert v. Carovano*, 851 F.2d 561, 572 (2d Cir. 1988) (en banc)).

BEC and Levy argue that the SAC fails to sufficiently allege that the Individual Plaintiffs were subjected to intentional discrimination due to their race. (Forest & BEC Mem. 10–15; Compass & Levy Mem. 10–12.) Essentially, BEC and Levy contend that Plaintiffs rely on conclusory allegations without alleging sufficient facts, (Forest & BEC Mem. 13; Compass & Levy Mem. 10–11), and that Plaintiffs improperly state a number of allegations "upon information and belief," (Forest & BEC Mem. 2–3, 11–12; Compass & Levy Mem. 11). The parties' specific arguments as to each of the categories of allegations of discriminatory treatment are addressed below.

### i. Harassment by Arena staff and security

In support of their claim against BEC,[9] the Individual Plaintiffs allege that they are

---

[9] The Court understands the discrimination claims based on harassment by Arena staff and security to be asserted against BEC only because, as discussed above, the allegations regarding harassment by Arena staff and security appear to be based solely on conduct allegedly undertaken by the employees or agents of BEC. (*Compare* Opp'n to Forest & BEC Mot. 3 (reciting allegations regarding harassment by Arena staff and security in statement of facts included in opposition to BEC's motion), *with* Opp'n to Compass & Levy Mot. 2–3 (including no allegations regarding harassment by Arena staff and security in statement of facts set forth in opposition to Levy's motion).)

"continually harassed, followed, and questioned" when they attend events at the Arena, and that, "upon information and belief, non-African-American patrons are not treated this way by the Staff." (*Id.* ¶ 39.) Plaintiffs also allege, upon information and belief, that BEC "directed Saurs to treat Defreitas suspiciously based on his race." (*Id.* ¶ 30.) Specifically, Plaintiffs allege that on two occasions Saurs asked Defreitas why he was frequently at the Arena and, during the second encounter, Saurs told Defreitas that he had a background in law enforcement and stated "sometimes I have to be the bad guy." (*Id.* ¶ 30.) The Individual Plaintiffs also allege that on one occasion they overheard a radio communication indicating that "the people in [the] Suite were considered a security threat" and, shortly thereafter, security raided another suite located in the Arena. (*Id.* ¶ 31.) The Individual Plaintiffs further allege, upon information and belief, that security's actual intent had been to conduct the raid in the Suite but, due to a mistake, the raid was carried out in another suite. (*Id.*) Plaintiffs argue that asserting their allegations on information and belief is appropriate as to the treatment of non-African-American patrons by Arena staff and security, BEC's instruction to Saurs regarding Defreitas, and the raid of a neighboring suite because these allegations pertain to facts within the exclusive possession and control of BEC. (Opp'n to Forest & BEC Mot. 5, 14–15.) With respect to the alleged instruction to Saurs, Plaintiffs assert that the Individual Plaintiffs "were not present when BEC directed its employees to treat Plaintiff Defreitas suspiciously because of his race, such information is company policy and is therefore within the sole control of Defendants." (*Id.* at 5 (internal citation omitted).) Similarly, Plaintiffs argue that they "cannot allege definitively that [the raid] was intended for [the Suite] because this information is also within the sole control of the Defendants." (*Id.* (internal citation omitted).)

BEC argues that Plaintiffs' allegations are conclusory and otherwise insufficient to

support a plausible inference of discriminatory intent. BEC asserts that Plaintiffs fail to allege any facts to suggest a plausible basis for the "information and belief" that, in contrast to the Individual Plaintiffs, non-African-American patrons are not "continually harassed, followed, and questioned." (Forest & BEC Mem. 11–12; Forest & BEC Reply 6.) In addition, BEC argues that Plaintiffs misstate the circumstances in which it is appropriate to assert allegations upon information and belief and fail to appreciate that such allegations must be accompanied by facts on which the belief is founded. (Forest & BEC Reply 5.) BEC also contends that "Plaintiffs fail to articulate any basis whatsoever for their supposed belief that BEC instructed Saurs to [treat Defreitas suspiciously based on his race]." (Forest & BEC Reply 6; *see* Forest & BEC Mem. 11, 16.) BEC argues that Saurs' alleged conduct during the specific instances cited by Plaintiffs does not support a plausible inference of discriminatory intent. (Forest & BEC Reply 6 n.7.) BEC further argues that Plaintiffs fail to plead any facts as to the basis for their belief regarding the intended target of the raid conducted by security, (Forest & BEC Mem. 11–12), and that Plaintiffs fail to allege a connection between the raid and the Individual Plaintiffs' race in any event because "Plaintiffs have actually alleged that Arena security's actions were . . . [undertaken] because 'people in [the Suite] were considered a security threat,'" (Forest & BEC Reply 7).

"When a plaintiff sets out allegations on information and belief, he is representing that he has a good-faith reason for believing what he is saying, but acknowledging that his allegations are based on secondhand information that [he] believes to be true." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011) (internal quotation marks and citation omitted) (alteration in original). The Second Circuit has explained that the "*Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts

alleged 'upon information and belief' where the facts are peculiarly within the possession and control of the defendant." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010). Some district courts in this Circuit have required that allegations upon information and belief be accompanied by a statement of the facts upon which the belief is founded. *See JBCHoldings NY, LLC v. Pakter*, 931 F. Supp. 2d 514, 527 (S.D.N.Y. 2013) ("[A]lthough a plaintiff may [plead facts upon information and belief] where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible, such allegations must be accompanied by a statement of the facts upon which the belief is founded." (citations omitted)); *Prince v. Madison Square Garden*, 427 F. Supp. 2d 372, 385 (S.D.N.Y. 2006) ("[A]llegations pled on 'information and belief' are proper if 'accompanied by a statement of the facts upon which the belief is founded.'"); *see also Sanders v. Grenadier Realty, Inc.*, 367 F. App'x 173, 175 (2d Cir. 2010) (affirming dismissal of discrimination claim under Fair Housing Act for failure to state a claim where plaintiffs alleged racial animus based on facts pled on information and belief and "plaintiffs allege[d] no basis for the 'information and belief' on which their assertion" was based).

Here, the Court has no basis from which to infer that Plaintiffs' belief regarding BEC's alleged instruction to Saurs is other than pure speculation and that facts in BEC's exclusive possession may plausibly support this contention. Nor do the allegations regarding Defreitas' encounters with Saurs support a plausible inference of any connection between Defreitas' race and Saurs' questions about why Defreitas was frequently at the Arena or between Defreitas' race and Saurs' comments about his law enforcement background and being "the bad guy." In addition, the Court has no basis from which to infer that Plaintiffs' belief that Arena security intended to raid the Suite is more than speculation. However, even if Arena security did intend

to raid the Suite, the allegations suggest that Arena security's interest in raiding the Suite was connected to the determination that "people in [the] Suite were considered a security threat." (SAC ¶ 31.)  There are no allegations in the SAC to support an inference that this security threat determination was connected to the race of the Individual Plaintiffs and their guests.  *See Yusuf*, 35 F.3d at 714 (affirming dismissal of § 1981 claim for failure to state a claim and concluding that plaintiff failed to sufficiently allege discriminatory intent because "the abundance of other possible reasons for the [challenged conduct] combined with the lack of any specific factual support for [the plaintiff's] claim of a racial motivation illustrate[d]" that the claim was based on a "naked allegation" of racial discrimination).  Therefore, the Individual Plaintiffs fail to plausibly allege discriminatory intent based on the allegations regarding harassment by Arena staff and security.

### ii.  Cleaning services

In support of their claim against BEC based on substandard cleaning services,[10] Plaintiffs allege that "housekeeping does not clean [the Suite] without a specific request, routinely leaving it dirty and disorganized."  (SAC ¶ 32.)  Plaintiffs also allege that "housekeeping service is proper" when the Suite hosts "numerous" Caucasian guests, (*id.* ¶ 33), and that "housekeeping service is proper at other suites, which are licensed by non-African Americans, and which host non-African Americans," (*id.* ¶ 34).  Plaintiffs allege a specific instance in which Pratt was cleaning the Suite himself because "housekeeping [had] left it as a mess" when a patron from the

---

[10]  The Court understands the discrimination claims based on the cleaning services provided to the Suite to be asserted against BEC only because, as discussed above, the cleaning service allegations appear to be based solely on conduct allegedly undertaken by the employees or agents of BEC.  (*Compare* Opp'n to Forest & BEC Mot. 2–3 (reciting allegations regarding cleaning services provided to the Suite in statement of facts included in opposition to BEC's motion), *with* Opp'n to Compass & Levy Mot. 2–3 (including no allegations regarding cleaning services provided to the Suite in statement of facts set forth in opposition to Levy's motion).)

neighboring CBS Radio suite observed Pratt cleaning and was "shocked" and asked Pratt why housekeeping was not cleaning the Suite. (*Id.* ¶ 36.) Plaintiffs further allege that the CBS suite is "regularly and immaculately cleaned." (*Id.* ¶ 37.) In addition, during the March 30, 2015 Hearing, Plaintiffs' counsel asserted that the CBS Radio suite is "run by various white people." (Tr. 26:14–19.)

Plaintiffs contend that the SAC provides sufficient allegations "based on the personal knowledge of the Plaintiffs" that "specifically demonstrate the disparate treatment afforded to Plaintiffs, and their non-Caucasian guests, as compared to the treatment afforded the Caucasian licensees and guests." (Opp'n to Forest & BEC Mot. 10.) BEC contends that Plaintiffs fail to plead any specific facts to support a plausible inference of discriminatory intent based on the allegations regarding cleaning services. (Forest & BEC Mem. 13.) BEC also argues that Plaintiffs' contention that "housekeeping service is proper at other suites, which are licensed by non-African Americans, and which host non-African Americans," (SAC ¶ 34), is not sufficient to allege that the other suites are similarly situated comparators because "Plaintiffs have not even endeavored to allege or explain how or at what events the suites were treated differently," (Forest & BEC Reply 8). During the March 30, 2015 Hearing, counsel for BEC also argued that the allegations regarding the CBS Radio suite and the encounter between Pratt and the CBS Radio patron are insufficient because the SAC does not allege sufficient facts to suggest the two suites are similarly situated. (*See* Tr. 13:16–14:2, 34:20–39:8.)

Plaintiffs have not alleged sufficient facts to support a plausible inference that BEC's alleged failure to provide adequate cleaning services to the Suite was racially motivated. Plaintiffs allege that, although the Suite is generally left "dirty and disorganized," (SAC ¶ 32), "housekeeping service is proper" when the Suite hosts Caucasian guests, (*id.* ¶ 33). However,

the Agreement states that BEC is required to provide cleaning services "within a reasonable time *after* each Event during which Licensee uses the Suite." (Agreement 5, ¶ 17(b) (emphasis added).) In contrast to food and beverage services, which are necessarily provided contemporaneously with the Suite's use during events, (*see id.* 4–5, ¶ 15), the individual BEC employees tasked with cleaning the Suite are not obligated to do so until after the Individual Plaintiffs and their guests have used it during an event and Plaintiffs have not alleged otherwise. Thus, the circumstances under which food and beverage services are provided to the Suite are such that the Court can infer the individual employees responsible for such services were aware of the race of the Individual Plaintiffs and their guests upon serving the Suite. However, the circumstances under which cleaning services are provided — after events and, presumably, in the absence of the Individual Plaintiffs and their African-American guests — do not give rise to a similar inference with respect to the individual employees responsible for cleaning the Suite. Nor have Plaintiffs alleged any facts about the particular people who cleaned the Suite, or the particular circumstances under which the Suite was cleaned, to support an inference that the individuals who cleaned the Suite had a way of knowing whether it had been used to host African-American or Caucasian guests such that they were in a position to modify the quality of the cleaning services accordingly. *See Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 758–59 (7th Cir. 2006) (upholding grant of summary judgment as to section 1981 claim because defendant had no way of knowing plaintiff's race at time of allegedly discriminatory conduct), *as amended on denial of reh'g* (May 25, 2006).

Plaintiffs' cleaning-services claim is premised on the alleged discrepancies between (1) the cleaning services provided to the Suite depending on whether it is used to host African-American or Caucasian guests and (2) the cleaning services provided to the Suite and the

Arena's other suites. However, Plaintiffs fail to allege specific facts and instead rely solely on a series of adjectives which Plaintiffs use to characterize the nature of the cleaning services provided in each case and the condition in which the Suite is generally left. Specifically, Plaintiffs allege that the cleaning services provided to the Suite are "deplorable," (SAC ¶ 32), that the Suite is "routinely le[ft] [] dirty and disorganized," (*id.*), that "proper" cleaning services are provided to the other suites in the Arena and to the Suite when it hosts Caucasian guests, (*id.* ¶¶ 33–34), and that the CBS Radio suite is "immaculately cleaned," (*id.* ¶ 37). Given their failure to allege facts to support these descriptive and conclusory allegations, the Individual Plaintiffs fail to state a claim based on the cleaning services provided to the Suite. *See Green v. McLaughlin*, 480 F. App'x 44, 49 (2d Cir. 2012) (affirming dismissal of prisoner's Eighth Amendment excessive force claim based on encounter with correctional officers because, "[a]lthough [the plaintiff] characterize[d] his encounter with the officers as an 'attack,'" the plaintiff failed to allege facts about the encounter and, as such, the court had no basis to infer that the officers' conduct constituted cruel and unusual punishment); *see also DM Research, Inc. v. Coll. of Am. Pathologists*, 170 F.3d 53, 55 (1st Cir. 1999) ("While the plaintiff's 'facts' must be accepted as alleged, this does not automatically extend to . . . subjective characterizations . . . ." (citation omitted)); *Fisher Bros. Sales v. United States*, 46 F.3d 279, 286 (3d Cir. 1995) (affirming dismissal of claims brought under Federal Tort Claims Act and stating "the fact that we must accept the plaintiffs' version of the facts as true does not mean that we must accept plaintiffs' *characterization* of those facts").

In addition, the Court is not persuaded that a single specific reference to the alleged discrepancy between the cleaning services provided to the Suite and the CBS Radio suite on a single occasion, (*see* SAC ¶ 36), is sufficient to infer that racial animus is a plausible

explanation.  Therefore, the Individual Plaintiffs fail to plausibly allege discriminatory intent based on the cleaning-services allegations.

### iii.   Maintenance services

In support of their claim against BEC based on substandard maintenance services, Plaintiffs allege that, on one occasion when Defreitas was using the Suite, he "called maintenance to secure a TV that was falling from the wall," and the supervisor who responded stated, "did you or one of the kids pull the TV off of the wall?  TV's don't just fall off walls!" (SAC ¶ 43.)  Plaintiffs further allege that, when Defreitas explained "that no one had touched the TV," the supervisor stated, "it was just a question, it's weird that a TV would just fall off the wall."  (*Id.*)  Plaintiffs fail to plead any facts to suggest a connection between the alleged condition of the television located in the Suite or Defreitas' encounter with the supervisor, and the race of the Individual Plaintiffs or their guests.  Therefore, the Individual Plaintiffs fail to plausibly allege discriminatory intent based on the maintenance services allegations.

### iv.   BEC's refusal to interface with Defreitas

Plaintiffs allege that BEC has refused to send correspondence, tickets and invitations to Defreitas in his capacity as "manager" of the Suite.  (SAC ¶ 23.)  Plaintiffs allege that, at the time when BEC and Ludwig's entered the Agreement, Mastrota advised BEC that Defreitas would be managing the Suite and directed BEC to send all correspondence and tickets directly to Defreitas.  (*Id.*)  Plaintiffs also allege that BEC ignored these requests and instead sent all correspondence and tickets to Mastrota, (*id.*), including an invitation to a dinner organized for suite holders, (*id.* ¶ 28).  Plaintiffs further allege that Defendants did not provide them with tickets to certain "special events," including the "Legends Classic 2013," even though Plaintiffs were entitled to such tickets under the Agreement.  (*Id.* ¶ 29.)  When Mastrota reiterated his

instructions to BEC regarding Defreitas, BEC "refused to work through Defreitas." (*Id.* ¶ 23.)

Plaintiffs have not stated any allegations that suggest BEC's failure to re-direct correspondence and tickets from Mastrota to Defreitas was related to Defreitas' race. Although Plaintiffs allege Mastrota advised BEC of Defreitas' appointment at the time the parties entered the Agreement, the Agreement does not reflect Defreitas' appointment as Suite manager. The integration clause included in the Agreement provides, in pertinent part:

> This License Agreement is an integrated contract which contains all agreements of the parties with respect to the License, the Suite, the Arena and any other subject hereof. No other prior or contemporaneous agreement or understanding pertaining to the Suite shall be effective. This License Agreement may be modified in writing only, signed by the parties in interest at the time of the modification. There are no oral or written statements, representation, agreements *or* understandings that modify, amend or vary any of the terms of this License Agreement.

(Agreement 6, ¶ 23; *see also id.* at 4, ¶ 8 (provision precluding transfers or assignments).) Thus, the terms of the Agreement requiring written modifications undermine Plaintiffs' allegation, as it is possible that BEC failed to re-direct correspondence, tickets and invitations to Defreitas, not because of Defreitas' race, but because BEC did not view Defreitas' appointment as Suite "manager" as a valid modification of the Agreement, which is a valid and non-discriminatory explanation. *See Yusuf*, 35 F.3d at 714 (affirming dismissal of § 1981 claim and noting that "[the] complaint itself identifies a number of other, race-neutral factors that may have led to" the challenged conduct); *Rodriguez v. City of New York*, No. 13-CV-6552, 2014 WL 1399415, at *3–4 (E.D.N.Y. Apr. 10, 2014) (granting motion to dismiss employment discrimination claims because, although plaintiff alleged that she was subjected to discrimination on the basis of race and gender, "[plaintiff's] own complaint seem[ed] to offer an alternative, nondiscriminatory reason for the" challenged conduct); *Hussey v. N.Y.S. Dep't of Law/Office of Atty. Gen.*, 933 F. Supp. 2d 399, 407–08 (E.D.N.Y. 2013) (granting motion to dismiss employment discrimination

claims because allegations failed to support a plausible inference of racially discriminatory intent where "plaintiff's own [c]omplaint provide[d] at least two additional nondiscriminatory reasons for" the challenged conduct). Plaintiffs have therefore failed to allege facts supporting a plausible inference that BEC's alleged refusal to "work through" Defreitas was motivated by discriminatory intent.

### v. Theft of Defreitas' personal items

In support of their claim against BEC,[11] Plaintiffs allege that "on numerous occasions" Defreitas' personal items have been stolen from the Suite when the Individual Plaintiffs and their guests were not present. (SAC ¶ 42.) Plaintiffs fail to allege any facts to suggest a connection between Defreitas' race and the theft of his belongings. Plaintiffs therefore fail to plausibly allege that the theft of Defreitas' belongings was motivated by discriminatory intent.

### vi. Food and beverage services

In support of their claim against Levy,[12] Plaintiffs allege that the Individual Plaintiffs and their African-American guests are subjected to "deplorable" food and beverage service when

---

[11] The Court understands the discrimination claim based on the theft of Defreitas' personal items to be asserted against BEC only because, as discussed above, the allegations regarding the theft of Defreitas' personal items appear to be based solely on conduct allegedly undertaken by the employees or agents of BEC. (*Compare* Opp'n to Forest & BEC Mot. 3 (reciting allegation regarding the theft of personal items from the Suite in statement of facts included in opposition to BEC's motion), *with* Opp'n to Compass & Levy Mot. 2–3 (including no allegation regarding theft of personal items in statement of facts set forth in opposition to Levy's motion).)

[12] The Court understands the discrimination claims based on the food and beverage services provided to the Suite to be asserted against Levy only because, as discussed above, the allegations regarding food and beverage services appear to be based solely on conduct allegedly undertaken by the employees or agents of Levy. (*Compare* Opp'n to Compass & Levy Mot. 2–3 (reciting allegations regarding food and beverage services provided to the Suite in statement of facts included in opposition to Levy's motion), *with* Opp'n to Forest & BEC Mot. 2–3 (including no allegations regarding food and beverage services in statement of facts set forth in opposition to BEC's motion).)

they use the Suite based on three specific instances. (*Id.* ¶ 32.) During the first instance, the Individual Plaintiffs were accused of not paying for a pizza and Pratt was then charged $1,000 for the pizza, (*id.* ¶ 40); during the second instance, Defreitas and a "dark-skinned" guest were made to wait in excess of forty-five minutes for food and drinks they had ordered, ice was delivered to them in a "dirty" bucket, and Defreitas' guest was overcharged, (*id.* ¶ 41); and during the third instance, Defreitas and his African-American guests were made to wait an hour for the French fries they ordered to be delivered, (*id.* ¶ 44). Plaintiffs further allege that, when the Suite hosts Caucasian guests, such delays do not occur, (*id.* ¶ 45), and food service is "proper," (*id.* ¶ 33). Plaintiffs allege that "proper" food and beverage service is provided to the Arena's other suites, which are licensed and frequented by non-African-American patrons. (*Id.* ¶ 34.) Finally, Plaintiffs allege "upon information and belief, [that] Levy executives have directed their staff to provide subpar" services to the Suite, (*id.* ¶ 35.), and Levy "supervisor" Beckerman "has [] warned Levy employees to avoid [the Suite]," (*id.* ¶¶ 48, 50).

Levy argues that Plaintiffs fail to allege facts that support a plausible inference of discriminatory intent based on the food and beverage services provided to the Individual Plaintiffs and their African-American guests. (Compass & Levy Mem. 11.) Levy also argues that Plaintiffs fail to allege any facts as to the basis for their belief that Levy executives issued the directive to their staff. (*Id.*) Levy further argues that, even assuming Beckerman warned Levy staff to avoid the Suite, Plaintiffs fail to allege facts to suggest a connection between Beckerman's warning and the Individual Plaintiffs' race. (Compass & Levy Reply 4.) Plaintiffs argue that the directive from Levy executives is properly alleged on information and belief because "Plaintiffs were not at the meeting when [Levy executives] directed [their] employees to provide subpar service to [the Suite], [and] such information is company policy and is therefore

within the sole control and knowledge of Defendants." (Opp'n to Compass & Levy Mot. 6.) Plaintiffs also contend that the SAC pleads sufficient facts to allege discriminatory intent because Plaintiffs allege that Beckerman "warned Levy employees to avoid [the Suite], [and] thereby provide[] subpar service to the Individual Plaintiffs and their guests." (*Id.* at 11–12.)

The food and beverage service allegations are not sufficient to allege discriminatory intent. First, the conduct alleged during the three instances specified — in which Levy employees were allegedly responsible for delayed food deliveries, erroneous charges and a "dirty" ice bucket — does not, by itself, give rise to a plausible inference of discriminatory intent. *See Bentley v. Mobil Gas Station*, No. 12-CV-6586, 2014 WL 1478697, at *1–2 (W.D.N.Y. Apr. 15, 2014) (dismissing § 1981 claim because plaintiff failed to allege any facts to suggest a racial motivation for conduct of gas station employees who served other customers prior to plaintiff and then banned plaintiff from store), *aff'd sub nom.*, *Bentley, Jr.*, 599 F. App'x at 396. Second, while Plaintiffs allege that "proper" and prompt food and beverage service is provided to the other suites in the Arena and to the Suite when it hosts Caucasian guests, these allegations are descriptive and conclusory and are not supported by any specific factual allegations. Finally, even assuming Levy executives directed employees to provide subpar service to the Suite and Beckerman warned employees to avoid the Suite, the Court has no basis to infer a connection between these instructions and the race of the Individual Plaintiffs and their guests. *See Watson v. N.Y. Pressman's Union No. 2*, 444 F. App'x 500, 502 (2d Cir. 2011); *Yusuf*, 35 F.3d at 714. Plaintiffs therefore fail to sufficiently allege discriminatory intent based on the allegations regarding food and beverage services.

### vii. Access to Suite refrigerators

In support of their claims against both BEC and Levy, the Individual Plaintiffs allege that

they are "routinely" denied access to refrigerators located in the Suite despite their entitlement to access the refrigerators as reflected by the inclusion of their names on an "access list." (SAC ¶ 38.) The Individual Plaintiffs further allege that they are directed to obtain verification from a supervisor, and access is often still denied even after they obtain such verification. (*Id.*) Plaintiffs do not allege any facts to support a connection between the limitations imposed on their access to the Suite refrigerators and their race. *See Bentley, Jr.*, 599 F. App'x at 396. Plaintiffs have therefore failed to allege facts that support a plausible inference of discriminatory intent based on the extent of their access to the Suite refrigerators.

For the reasons set forth above, the Individual Plaintiffs fail to sufficiently allege discriminatory intent in support of their section 1981 claims against BEC based on the alleged harassment by Arena staff and security, the cleaning services allegations, the maintenance services allegations, BEC's refusal to interface with Defreitas, and the theft of Defreitas' personal items. The Individual Plaintiffs also fail to sufficiently allege discriminatory intent in support of their section 1981 claim against Levy based on the food and beverage services allegations, and their claims against BEC and Levy based on allegations regarding the Suite refrigerators. Because the Individual Plaintiffs' failure to sufficiently allege discriminatory intent is dispositive, the Court concludes that the Individual Plaintiffs fail to state a claim under section 1981 and grants the motions by BEC and Levy as to the Individual Plaintiffs' section 1981 claims.[13]

### f.    NYSHRL claims against BEC and Levy

Plaintiffs allege that BEC and Levy violated the Individual Plaintiffs' rights under the

---

[13] Because of the Court's ruling on Plaintiffs' failure to allege discriminatory intent, the Court does not address BEC and Levy's additional arguments in support of their motions to dismiss the section 1981 claims.

NYSHRL by discriminating against the Individual Plaintiffs and their African-American guests on the basis of race.  (SAC ¶¶ 54–55.)

The NYSHRL states, in relevant part:

> It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, resort or amusement, because of the race, . . . of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof . . . .

N.Y. Exec. Law § 296(2)(a).  A plaintiff must sufficiently allege that the defendant intended to discriminate on the basis of race to state a claim under both section 1981 and the NYSHRL.  *See Self v. Dep't of Educ. of the City of N.Y.*, 844 F. Supp. 2d 428, 434, 436–38, 439 (S.D.N.Y. 2012) (granting defendants' motion for summary judgment as to discrimination claims under § 1981 and NYSHRL because plaintiff failed to establish racial animus); *Perez Rivera v. Hertz Corp.*, 990 F. Supp. 234, 236–37 (S.D.N.Y. 1997) ("To establish a claim under section 1981 or the NY[S]HRL, plaintiffs must prove that . . . [the] defendant's actions were purposefully discriminatory and racially motivated.").  Therefore, the Court need not conduct a separate analysis.  For the reasons set forth above with respect to the section 1981 claims, the Individual Plaintiffs fail to sufficiently allege discriminatory intent in support of their NYSHRL claims. The Individual Plaintiffs therefore fail to state a claim under the NYSHRL against BEC or Levy and the motions are granted as to the NYSHRL claims.

### g.  NYCHRL claims against BEC and Levy

Plaintiffs allege that BEC and Levy violated the Individual Plaintiffs' rights under the NYCHRL by discriminating against the Individual Plaintiffs and their African-American guests on the basis of race.  (SAC ¶¶ 69–71.)

The NYCHRL states, in relevant part:

> It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation, because of the actual or perceived race . . . of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof . . . .

N.Y.C. Admin. Code § 8-107(4)(a). "[C]ourts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing the NYCHRL's provisions 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible.'" *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (citations omitted). "To state a claim for discrimination under the NYCHRL, a plaintiff must only show differential treatment of any degree based on a discriminatory motive . . . ." *Gorokhovsky v. N.Y.C. Hous. Auth.*, 552 F. App'x 100, 102 (2d Cir. 2014) (citing *Mihalik*, 715 F.3d at 114). However, even under this more liberal pleading standard, a plaintiff must still plausibly allege that he was subjected to unequal treatment because of his protected characteristic. *See Mihalik*, 715 F.3d at 110 ("[D]istrict courts must be mindful that the NYCHRL is not a 'general civility code.' The plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive."); *LaSalle v. City of New York*, No. 13-CV-5109, 2015 WL 1442376, at *6 (S.D.N.Y. Mar. 30, 2015) (granting motion to dismiss race discrimination claim under NYCHRL because, notwithstanding "the more lenient standard of the NYCHRL," plaintiff failed to allege facts supporting an inference that "she was treated 'less well' than other employees because of her race"); *see also Sosa v. Local Staff, LLC*, 618 F. App'x 19, 20 (2d Cir. 2015) ("Although we construe the NYCHRL more broadly than its federal and state counterparts, we recognize that it still does not operate as a general civility code." (internal quotation marks and citations omitted)).

    As discussed above with respect to the section 1981 claims, the Individual Plaintiffs fail

to allege facts that support a plausible inference of discriminatory intent and, therefore, they cannot state a claim under the NYCHRL. Accordingly, the Court grants the motions and dismisses the NYCHRL claims against BEC and Levy.

### h. Supplemental jurisdiction over breach of contract claims against BEC

Having dismissed all of Plaintiffs' federal claims — under sections 1983 and 1981 — over which the Court had original jurisdiction, the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining breach of contract claims against BEC.[14]

District courts have supplemental jurisdiction over state law claims "in any civil action of which the district court[] ha[s] original jurisdiction," provided the claims "are so related to claims in the action . . . that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a); *Montefiore Med. Ctr. v. Teamsters Local 272*, 642 F.3d 321, 332 (2d Cir. 2011) (noting that federal courts may exercise supplemental jurisdiction when federal claims and state claims "stem from the same 'common nucleus of operative fact'" (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966))). A district court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."[15] 28 U.S.C.

---

[14] The SAC asserts a breach of contract claim pursuant to paragraph 17(b) of the Agreement on behalf of all Plaintiffs. (SAC ¶¶ 62–67.) As the Court dismissed the breach claims against Forest, Compass and Levy during the March 30, 2015 Hearing for the reasons set forth above, only the breach claims against BEC remain. While BEC moved to dismiss the Individual Plaintiffs' breach of contract claim, it did not challenge the breach claim asserted by Ludwig's. (Forest & BEC Mem. 17.) Because the Court declines to exercise supplemental jurisdiction over the breach of contract claims, the Court does not address the sufficiency of the Individual Plaintiffs' breach claim against BEC pursuant to the Agreement.

[15] The Court may decline to exercise supplemental jurisdiction over Plaintiffs' breach of contract claims notwithstanding the Court's decision to exercise supplemental jurisdiction over the merits of the Individual Plaintiffs' NYSHRL and NYCHRL claims. *See McCaul v. Ardsley*

§ 1367(c)(3); *Alliance of Auto. Mfrs., Inc. v. Currey*, --- F. App'x ---, ---, 2015 WL 1529018, at

*3 (2d Cir. Apr. 7, 2015) (holding it was "not improper for the court to decline to exercise its

supplemental jurisdiction" after it properly dismissed the plaintiff's constitutional claims);

*Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994) ("[I]f the federal claims are dismissed

before trial, even though not insubstantial in a jurisdictional sense, the state claims should be

dismissed as well." (alteration in original) (quoting *Castellano v. Bd. of Trustees*, 937 F.3d 752,

758 (2d Cir. 1991))).  Accordingly, Plaintiffs' breach of contract claims against BEC are

dismissed without prejudice.

## III.  Conclusion

For the foregoing reasons, the Court grants BEC's motion to dismiss the SAC in part and

grants Levy's motion to dismiss in its entirety.  The Court dismisses Plaintiffs' section 1981,

NYSHRL and NYCHRL claims against BEC and declines to exercise supplemental jurisdiction

over Plaintiffs' breach of contract claims against BEC.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated:  March 4, 2016
　　　　Brooklyn, New York

---

*Union Free Sch. Dist.*, 514 F. App'x 1, 4–6 (2d Cir. 2013) (holding that district court did not abuse its discretion in exercising supplemental jurisdiction to decide motion to dismiss one state law claim while declining to exercise supplemental jurisdiction over another state law claim and noting that the elements of the state law claim dismissed pursuant to Rule 12(b)(6) were "substantially the same" as those of the federal claim); *see also* 32A Am. Jur. 2d Federal Courts § 615 ("A court may decline supplemental jurisdiction at any stage of litigation, and the fact that it may have previously exercised such jurisdiction is not a bar to later relinquishing it.").